**912**

Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC (District 31), Defendant,

Edward Sadlowski, Intervenor.

Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Edward Sadlowski–Intervenor Plaintiff, Anthony Tomko–Intervenor Plaintiff,

v.

UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC (District 15), (District 31), Edward Sadlowski, intervenor above named and the following counsel for Sadlowski: Joseph L. Rauh, Jr.; Leon Despres; Kenneth J. Yablonski; and Judith Schneider.

Civ. A. No. 73–957.

United States District Court, W. D. Pennsylvania.

Oct. 31, 1980.

As Amended Jan. 21, 1981.

Sylvia T. Horowitz, Dept. of Labor, Washington, D. C., for plaintiff.

Michael H. Gottesman, David M. Silberman, Washington, D. C., for defendant.

John W. Douglas, Washington, D. C., for claimant.

## OPINION

ROSENBERG, District Judge.

This matter is before me now on remand from the Court of Appeals on the claims of four attorneys for the Intervenor, but none by the Intervenor, himself. It is here now for the determination of a factual issue as that determination is either supported or not by a preponderance of the evidence in the case. That issue is whether such evidence supports an award of counsel fees to an intervenor's attorneys on an equitable basis on the "common benefit" theory. *Brennan v. United Steelworkers of America*, 554 F.2d 586, C.A.3, 1977.

Rather, the issue is broadened to the extent that this court must, should or can determine from the evidence adduced by these attorneys whether their aggregate contribution of service brought about a common benefit to the defendant's total membership of what, if any, service was rendered by the three attorney–claimants and one legal assistant, and the proportion of contribution each may have made for entitlement to each one's claim (since each made separate claims) in achieving a successful outcome for the plaintiff–as such commonly benefitted the total membership of the defendant. If indeed each did make a material contribution in his or her way as attorneys for the successful outcome of this action, it is obvious from the evidence produced that the four did not act in unison or act commonly for an aggregate fee, but that each would be entitled to an amount

for services so rendered and that each would require individual evidence to support the individual entitlement.

This action was brought originally by Peter J. Brennan, Secretary of Labor (Secretary), against the United Steelworkers of America, AFL–CIO–CLC, Districts 31 and 15 (International).[1] Anthony Tomko, the defeated candidate in District 15 and Edward Sadlowski, the defeated candidate in District 31 were eventually permitted to intervene. However, after the plaintiff and defendant requested me to sign an order of court settling the case by ordering a new election in District 31, the intervenor objected to the settlement for pointless reasons and I ordered the settlement. Application for counsel fees for the four intervenor's attorneys followed. I denied this for lack of statutory authority. On appeal, Judge Van Dusen in an opinion for the court determined that the intervenor's attorneys would not be precluded from recovering counsel fees under Title IV of the Labor–Management Reporting and Disclosure Act under the broader application of the "common benefit" rationale; and if so allowed, the amount of such an award would be a required determination. These two questions, only, were returned for my consideration. Being bound by the law of the Court of Appeals, I proceed to inquire into and adjudicate those two questions by a preponderance of all the evidence in the case.

Of course, I do not disregard two principles expounded first by Judge Aldisert in his dissenting opinion in *Brennan v. United Steelworkers of America, supra,* at page 613. And second in Mr. Justice White's dissent in *Brennan v. United Steelworkers,* 435 U.S. 977, 979, 98 S.Ct. 1627, 1628, 56 L.Ed.2d 71 (1978). The principle expounded by Judge Aldisert in his dissenting opinion is disagreement with the proposition "that the consensual agreement to a new election for District Director in Illinois and Indiana conferred a common benefit upon the entire membership of the United Steelworkers of America". The dissenting opinion of Mr. Justice White is to the effect that it would have been improper for an intervenor to interfere (if he did) with the Secretary of Labor's discretionary and exclusive enforcement authority in this area, since "the rationale permitting intervention was not to duplicate the efforts of the Secretary", and further that the exception to the traditional American rule against awarding attorneys' fees on the common benefit theory premised on a court's equity power should not be expanded.

I assigned the original inquiry to United States Magistrate Robert C. Mitchell who broadened the parties' prerogatives to present all the evidence they desired. Thereupon all the parties did provide the magistrate with a large volume of depositions and affidavits, and he personally presided over a large part of the case. From all these the magistrate made findings of fact, conclusions of law and a report and recommendation disallowing the attorneys' fees to the claimants because of a lack of foundation in the evidence to support the wide variety of assertions made by them.

After a lengthy and carefully scrutinized examination of this report and the record made by the parties, I confirm the findings of fact of the magistrate and adopt his recommendation as my findings of fact. But I do not act on this alone. I here set forth additional findings of fact as I supplement the magistrate's report and findings and as I, the presiding judge, have found them to be factual from the evidence and the proceedings in this case before me personally.

As I have already stated, this issue was originally presented to me by an application for attorneys' fees immediately after I signed the order for a settlement. Other than the pleadings, originally, there was no proof presented nor was any request made for a formal hearing or for the privilege of presenting any proof to me of entitlement

1. The caption of the case was amended to name the successor plaintiff, Ray Marshall, Secretary of Labor.

to attorneys' fees. The total amount demanded seemed exaggerated in view of the knowledge which I had of the case. No evidence or law was presented to me to convince me of any legal entitlement. This last statement explains that the Court of Appeals as well did not have any evidence before it to support any legal entitlement to fees by the claimants, but was required to base its determination of law upon what the claimants only asserted to be facts without the necessary proof which should have been given to me.

As the Court of Appeals said:

"We emphasize that we are not passing on the truth of the statements in the record or on the character of the intervening plaintiffs, as opposed to that of the high–ranking officers of the union, but we are required, under the posture of the case as it existed at the time of the district court order from which the appeal was taken, to take all well–pleaded allegations in the record as true for purposes of this appeal and to construe them in the light most favorable to the plaintiffs." (554 F.2d at pages 589–590)

The pleading raising the issue of fee entitlement was identified as "Verified Application for Attorneys' Fees", and was filed not by the intervenor himself but by three lawyers and one law assistant who assert that they acted in behalf of the intervenor. The inquiry before me, therefore, is towards payment or non–payment of fees to the claimants who, assertedly, had been the intervenor's lawyers in the case before me.

The Court of Appeals, on return to me, provided me with the following:

"Whether an award is warranted and, if so, the amount of such award, is a matter for initial determination by the district court in the light of the broader application of the 'common benefit' rationale . . ." (554 F.2d at page 608).

Based upon the directive of the Court of Appeals, the claimants were given additional opportunities to present evidence to support their respective contentions and to present sufficient evidence of persuasiveness and the defendant also was given similar opportunities to present evidence if it could contrarywise so that from receipt of the evidence of both parties this court might have sufficient evidence, pro and con, for a determination legally by the preponderance of all of the evidence in the case of whether an award was or was not warranted as now based upon the common benefit rationale in accordance with the guidelines of the Court of Appeals. This, it will be noted, differs from that of the case originally when the question before me was on the theory of whether attorneys' fees were awardable generally as a matter of law in Title IV of the Labor–Management Reporting and Disclosure Act of 1959. And so at the time neither the claimants nor parties plaintiff and defendant believed it necessary to present such evidence, pro and con, as is now before me for a judicious determination.

### HISTORY AND FINDINGS

An overall election was held on November 13, 1973 by the defendant, United Steelworkers of America, for the election of directors in its 35 geographically divided, nationwide Districts, encompassing a total membership of 1,400,000 members. After the election, 6 complaints out of 35 Districts came to the Secretary of election irregularities. Then after these six complaints were investigated, the Secretary concluded that only two merited action which was filed in this court. These were, from his findings, District 15 where the defeated candidate, Anthony Tomko, and District 31 where defeated candidate, Edward Sadlowski, filed complaints. The Department of Labor brought this action on its own accumulated evidence for the procurement of a satisfactory resolution in these two Districts.[2]

Both Sadlowski in District 31 and Tomko in District 15 asked to intervene. The complaint was separated by this court into "A" and "B" parts for Districts 15 and 31.

---

2. The settlement in each District was different. In District 15, it was the adoption of a new set of nomination procedures. In District 31, both parties agreed to a supervised re–run election.

From that point my concern and attention in this determination is to the procedures and the circumstances in District 31 as they bear any significance to the merit or the lack of merit to the intervenor's claimants' claim for attorneys' fees, except in those instances where explanatorily related factual references will be pointedly made to District 15.

As I stated before, in order to give the claims the fullest consideration, I first referred the matter to a United States Magistrate for a detailed inquiry. His report is elaborate, searching and pointed. Objections were filed to his report by the claimants and by the defendant in its "Response to Objections of Intervenor". I have examined and re-examined the record carefully and I am now in a position to arrive at the following factual findings from the total record in the case, the magistrate's report, and from my own knowledge judicially acquired while presiding in the case.

The members of District 31 who might have benefitted, if any benefit arose from the action of the claimants, comprise 1/10th of the membership of the United Steelworkers upon whose 1,400,000 members nationally would fall the obligation to pay the claimants' bill under the common benefit theory. Accordingly, as the presiding judge, I must be judicially satisfied that the claimants' claims are justified, reasonably earned, fair and of benefit to the total union's membership, as a matter of equity, before I can in good conscience place this liability upon the defendant's more than one million men and women upon whose wages such liability would likely attach, before they are entitled to receive them. District 31 which covers a geographic area including parts of northwestern Illinois and northwestern Indiana comprises a membership of approximately 126,000.

While it is incumbent upon me to hear evidence and award any fairly earned attorneys' fees, it was not at the beginning when the fee application was first filed, incumbent upon me to seek out the claimants and demand that they produce evidence–whether they wanted to or not–or whether they could not; however, no pleading or indication came from them demonstrating or even indicating any readiness to proceed to satisfy me of their entitlement to any sums of money, since they argued only their legal rights to fees. Accordingly, based upon only the contents of the filed petition, I was not prepared to make any firm determination of entitlement or to adjudicate quantitative entitlement upon any conclusionary summaries of activities and amounts as averred in the petition. Particularly, I was not so inclined when many of the averments in the petition were contrary to the facts in the case as I knew them to be as the presiding judge. Some of these I shall presently point out.

Immediately, or soon after the complaints of election irregularities were received, the Secretary assigned a large number of experienced Department of Labor (DOL) Compliance Officers, all under the directions of supervisors to investigate the 6 election complaints. The investigators had frequent consultations with the defeated candidates and hundreds of others. I accept the affidavit of Stephen Ernst, Chief Trial Counsel for the Secretary of Labor, who made factual averments and to which no counter-affidavit was filed; and now incorporate these as some of the findings of fact in this case, particularly as these relate to District 31. However, insofar as the activity of the Secretary is concerned, I shall indicate only that much as may have been inter-related in the continuing inquiry into the complaints, their processing and terminations in all six Districts from which reports of irregularities came to the Secretary, sufficient to induce the Secretary to procure overall evidence.

As far as District 31 is concerned,

(1) The Secretary had assigned 19 DOL Compliance Officers to the investigation of this District, and over 3,600 person hours were expended by them in the process;

(2) Chief Trial Counsel, Stephen Ernst, accumulated "several file drawers of materials" in his office and additional boxes of materials in the Chicago office of the Secretary of Labor (Ernst Affidavit II, paragraph 5); and

(3) The evidence so adduced by these DOL investigators and the Secretary's counsel was more than sufficient for the Secretary to pursue the action in District 31 (again without regard to the other five districts) where the evidence was so abundant as to make it feasible to proceed to trial without formal discovery, except for such as the defendant may have desired.

Counsel for the Secretary had accumulated by these investigations more than enough evidence to enter this action and to carry it to completion without aid from the intervenor or any of the claimants. The reason for this was that counsel for the Secretary had on the working staff highly motivated and skilled professional federal investigators upon whom complete knowledgeable reliance could be placed. However, that would not have prevented the Secretary from participating in any discovery which would be initiated by the defendant International. In fact the defendant had indicated to me, as I presently explain, the desire to depose a large number of members in the Chicago area. This was defense evidence, not plaintiff's evidence.

The activity of the Secretary and his staff of 19 DOL Compliance Officers was of such magnitude that one of the claimants' attorneys for the intervenor, Leon Despres, wrote to another claimant attorney, Joseph Rauh, on August 30, 1973 and admitted that the Secretary had accomplished comprehensive and conclusive results from the DOL investigation.[3]

While the Compliance Officers interrogated the two unsuccessful candidates, there is no evidence that the Secretary consulted with Sadlowski or his counsel on whether or not to commence any action in the United States District Court for the Western District of Pennsylvania, or in any other court. So thorough had been the work and so voluminous the results of the Secretary's staff that the Secretary was able to proceed with the entry of this action and pursue it.

As I just stated, this did not include the depositions which the defendant desired from a large number of voters in Election District 31. In fact, counsel for the plaintiff and defendant indicated their desire for this court to sit in Chicago for a week, more or less, to supervise the taking of such depositions.

The fact that on three or four occasions either Sadlowski or his attorney, Mr. Rauh, called the Secretary obviously had no effect upon the Secretary's determination to file suit, is corroborated by the affidavit of William J. Kilberg, Solicitor for the Department of Labor, who had final authority on the decision to sue. This was presented before the magistrate and was not contradicted by any counter–affidavit. He testified that:

> "It is clear that at no point in time, once the field investigation had been completed in early August, was there ever any doubt that short of a satisfactory settlement, the Department would sue in District 31." (Kilberg's Affidavit, paragraph 9).

> "I know, from my own knowledge, that nothing done by Mr. Rauh or any other attorney for Mr. Sadlowski contributed to the Department's decision to institute suit in District 31. That suit would have been instituted on the date it was instituted, whether or not Mr. Sadlowski had been represented by attorneys." (Kilberg's Affidavit, paragraph 29).

Since neither the Secretary nor any member of his staff who functioned for the Secretary in his procedure had reason to have personal interest in this matter, nor in the constant flow of such labor cases coming for their attention and processing, I give high credibility and great weight to their testimony. This is more so true because of the many conflicting assertions made by Sadlowski's supporters, particularly as I know the facts in the case which came before me in open court.

---

3. This letter of Despres and another letter addressed to Rauh was evidently for the purpose of obtaining "encouragement or information that might help Sadlowski in the Campaign" and praised the Secretary and his staff for the intensive investigation which the Secretary had carried on and stated that "[a] new election seems likely" to occur for Sadlowski's benefit.

All in all, I endeavored to detailedly scrutinize the voluminous summary recitals presented in affidavit form to the magistrate by the claimants as these were presented with a changed attitude in derogation of practically all which the Secretary of Labor, his counsel and the large number of DOL investigators had done. Previously, counsel lauded the Secretary's DOL officers' activities. Had the claimants' Narrative given some fair evaluation to the Secretary and his staff, as counsel had done in their previous letters, and been less self-laudatory, they might have been more credible as to such matters which they averred as being out of court.

As to their recital of boasts of their in-court activities and their specific influence on this court in securing an ultimate settlement[4] and decree for a new election, I not only reject these in-court statements, but as well I find many of their out-of-court statements contradicted or unsupported by the evidence. Thus, the claimants' proof is insubstantial and insufficient and lacking persuasiveness enough for me to hold their contentions (and claims) proven by a preponderance of the evidence in the case as a whole. I make this conclusion as the presiding judge who had a more impartial knowledge of the in-court facts involved than any other person in the case.

The Secretary of Labor through his official counsel filed this action on November 8, 1973.

Soon after that Edward Sadlowski, the defeated candidate in District 31, filed for leave to intervene. On January 21, 1974, the plaintiff and defendant stipulated to separate the trial relating to Districts 15 and 31 and designated them as District 15, Part "A" and District 31, Part "B". The plaintiff accordingly filed a complaint in each of these separately in order to identify the facts which he alleged to be pertinent to each of these Districts. These amended complaints were filed January 28th.

On February 12th, the defendant filed answers to the amended complaints as related to these two Districts.

The matter came before me in open court for the first time on the motion of the plaintiff to expedite the trial of both Parts A and B.

The second open–court matter before me came when the plaintiff requested a preliminary injunction and clarification of the pre-trial order. The intervenor's counsel was also present, but was more an observer than a participant. On this occasion in court, counsel for both the plaintiff and defendant attempted to have me make a determination on the admissibility of evidence which had been presented in a previous labor case and explained that it would simplify this case. I denied the motion as being premature and informed counsel I would require facts in evidence before I could make a determination on the admissibility of any evidence, especially such as was not yet before me.

The next activity occurred when both plaintiff's and defendant's counsel desired someone to preside over the taking of depositions (presumably desired by the defendant) of a large number of witnesses in District 31 in Chicago, asserting that the taking of such depositions would be helped by the court's supervision. This would have required at least one week's time. I held the matter in abeyance and informed counsel that consideration would be given to this at a future, appropriate time. The intervenor's counsel was of no significant help here to the plaintiff.

In the meantime, I urged counsel for the plaintiff and defendant to continue their attempt (as I had previously stated) to reach a settlement in the case, since this would save the work of the court in Chicago and the many months which counsel indi-

---

4. During my in–court hearings and arguments, some time was shared in discussing settlement with the plaintiff's and defendant's counsel, and they informed me that the Secretary's aim from the beginning was to arrive at a settlement by having the defendant agree to a new election. Evidence in the case supports the plaintiff and defendant counsels' statements of settlement aims. This settlement the Secretary's and defendant's counsel eventually achieved.

cated would be necessary for the trial. Counsel for the plaintiff and defendant agreed with me and informed me that they were interested in a settlement and agreed with me that a lengthy trial was unwarranted and would serve no good purpose.

Counsel for the plaintiff and defendant assured me that settlement discussions had taken place and offered to exert every effort to bring about such a result. They agreed to bring the matter earnestly to the attention of their respective principals. That evidently helped their hitherto settlement efforts, because on August 2, 1974, counsel for the plaintiff and defendant did file a motion for the approval of a settlement agreement between the plaintiff and defendant.

On March 29th, 1974 the first active record participation which the intervenor's counsel exerted was in giving notice of two depositions, one to the successful candidate and the other to Joseph Jeneske. Request was also made for the production of documents.

The next record activity in which the intervenor's counsel participated was on May 28, 1974, when the defendant gave notice to take the deposition of the intervenor, Edward Sadlowski and requested the production of documents.

On June 25th, 1974, notice was given of the taking of depositions by Joseph Rauh, the intervenor's counsel, to Stanley Lachen and Danny Cifalia. A second notice was dated July 16th. Counsel then gave notice of a deposition to Fermine Salinas on July 29th.

Here I comment on the notices given by intervenor's counsel to the various witnesses for depositions and find as a fact that all of these notices and the taking of depositions of those named were irrelevant to the plaintiff's case and superfluous. Rather than detail the depositions taken by the intervenor, I shall, in order to save time and space, summarize what was attempted by them. In these the intervenor's counsel concentrated on procuring information from the witnesses on the financing of the campaign prior to the election in which Sadlowski was the defeated candidate.

■ When a party's attorneys admit certain facts, it is incumbent upon the trial judge to give as much credibility as possible to such admissions of counsel. For instance, Leon Despres, one of the attorneys for the intervenor in a letter dated May 24, 1974 to Joseph Rauh, co-counsel for the intervenor, indicated that these depositions had political and not legal significance. Despres stated:

"The reason we felt it necessary to take these depositions was to compel these men to refuse to divulge payments out of USW funds for Evett campaign contributions or expenditures. Since USW said it would take Sadlowski's deposition, I felt it was psychologically very important to have these refusals precede Ed's testimony. Thus his frankness of disclosure will stand in sharp contrast." (Despres Deposition, Exhibit 11).

I repeat, that any financial circumstance would not possibly be a usable element in the plaintiff's case against the defendant, as I presently point out.

Thus, since the majority of the questions asked of the deponents were focused on financial issues, it is corroboratingly evident that counsel claimants were politically motivated to procuring another election to promote Sadlowski and give him another chance for victory at a second election, rather than gaining relevant evidence to aid the plaintiff and the court in making findings of fact for the resolution of procedural issues before it.

Discovery concerning the financial issue was irrelevant and nothing gained by these would have been admissible in evidence in this case, because as the Department of Labor's investigation disclosed, and as not averred in its complaint, there were no violations involving the use of union funds. Therefore, any matter relating to finances would have been inadmissible if this case were tried. In fact, it was the Secretary's final Report of Investigation which concluded that Sadlowski's allegation that "union funds and materials were used to support

Evett's candidacy" was "not substantiated by investigation." (pages 71, 73).

## INTERVENOR LIMITED BY PLAINTIFF'S PLEADING

■ [Under the law the intervenor is bound by the pleadings of the case and neither Sadlowski nor his counsel could possibly add an additional claim not included in the Secretary's complaint, or contrary to its averments.] In *Trbovich v. United Mine Workers, et al.*, 404 U.S. 528, 537, 92 S.Ct. 630, 635, 30 L.Ed.2d 686 (1972), the Court denied the petitioner's request to add additional grounds for setting aside a union election. Mr. Justice Marshall stated:

"... These are claims that the Secretary has presumably determined to be without merit. Hence to require the union to respond to these claims would be to circumvent the screening function assigned by statute to the Secretary ... Accordingly, we hold that in a post election enforcement suit, Title IV imposes no bar to intervention by a union member, so long as that intervention is limited to the claims of illegality presented by the Secretary's complaint."

Neither does this court have jurisdiction to inquire into financial matters which the Secretary did not address in his complaint, and I am as restricted here as is the intervenor.

While in the briefs there are plenty of self–serving arguments of the extraordinary work done by the claimants outside the courtroom, it is noticeable that not one single averment is made in any of their pleadings which relates to discovery being conducted in order to support the claim of irregularities in the past election other than financial.

It should be observed perhaps in this connection that the intervenor was frank in revealing the fact that he had a personal interest in the action commenced by the Secretary. This he did, when he filed the motion for leave to intervene under Federal Rule of Civil Procedure 24 on December 20, 1973. There it is stated,

"7. Petitioner Sadlowski has a direct and substantial interest in the subject matter of this action and is so situated that the disposition of this action and the terms of any order entered will as a practical matter either impede or advance his ability to protect that interest.

8. Petitioner Sadlowski's interest is not adequately represented by the parties in this action ..."

Furthermore, in the intervenor's complaint filed December 10, 1973, he adopted and incorporated "by reference the allegations set forth in paragraphs I, II, III, IV, V, VI, XI, XII, XIII and XIV" of the complaint filed by the Secretary.

■ While in paragraph XIII, the plaintiff stated that "Funds of local labor organizations were used to purchase tickets to a dinner in support of Samuel Evett", it would appear to involve financial matters, but that is the only place where financing of election campaigns is raised. Thus, it would seem that the intervenor might have raised, but even this not legally, financial matters relating to the dinner, and to the dinner only; but his discovery ranged far and wide to legislative and educational funds, to voluntary political education committee funds; to a strike relief fund; and, fourteen other similar financial subject matters. None of these were raised as irregularities by the Secretary. Furthermore, the Secretary ruled, as verified by Ronald Lehman, Counsel for the Department of Labor, that no questionable financial activities were involved. (Lehman deposition, page 35). The intervenor through his able counsel knew that none of these financial issues had any relevancy in the case and knew that he was limited to the issues set forth in the Secretary's complaint. *Trbovich, supra*, at page 537, 92 S.Ct. at 635. Accordingly, what the claimants raised in their depositions is so far and wide of the issues presented by the Secretary as to be frivolous. This is also aside from the principle laid down in *Trbovich, supra*, at page 531, 92 S.Ct. at 632, that Congress has constituted suit by the Secretary of Labor to be the exclusive post–election remedy for a violation of Title IV.

Thus, I find that the intervenor's depositions were not taken in good faith for the purpose of aiding the court in a fair and judicial determination of the issues in this case. One indication of this is a letter from the intervenor's counsel Rauh to co–counsel Leon Despres dated February 7, 1974. This letter commended the trial attorney for the Secretary as being "able, energetic and quite determined to win" as well as commending the amount of evidence already gathered by the government. The claimants undoubtedly accepted the inevitability of the new election as fact from the report of the investigation of the Department of Labor's Compliance Officers, and so counsel knew that the depositions filed subsequently by notices on June 25th, July 16th and 29th, 1974 were worthless—except for their ulterior, political purposes. I hold that such discovery activities by Sadlowski and his counsel were of no help to the plaintiff and were injected only for self–serving purposes. As such these activities of Sadlowski's counsel cannot be deserving of any equitable compensation by the entire membership of the defendant–or any of the 35 Districts.

## CLAIMANTS' OBJECTIONS TO SETTLEMENT

The next activity by the claimants (personally) on the record file was a request for an oral argument of their objections to the motion for approval of the settlement agreement by the plaintiff and defendant. That was not necessary because I had already scheduled a hearing on the matter in order to ascertain the appropriateness of such a settlement.

At the hearing both counsel for the plaintiff and for the defendant extolled the virtues of a settlement, and stressed the savings of months of trial time and energy. But counsel for the intervenor objected primarily on two grounds: (1) that, since I was requiring that the new election must be held within 90 days of an order of settlement, the forecoming election would be within two or three days of Thanksgiving and inconvenient for voters; and (2) that an election by mailed ballots could not be worked out within 90 days.

I disagreed with the intervenor's counsel and overruled his objections. First, I did not see why an election could not be held before Thanksgiving–and counsel for the plaintiff and defendant agreed that it could and assured me that it would be so held. Second, there was no evidence before me that a new election would be conducted by mail as the intervenor's counsel argued that it would be. I informed all counsel that the method of conducting the election, if specifically voted by the International for future elections, would not bind the Secretary in conducting a second election, and the conduct of an election by this agreed upon order of court would be completely within the discretionary functioning of the Secretary who was required by law to appropriately and adequately conduct the election. I stated emphatically that I would not interfere with the discretion of the Secretary.

## ALLEGED BENEFITS CONTRIBUTED BY INTERVENOR–CLAIMANTS

The claimants in their briefs make much of the unusual activity expended by them in bringing about the settlement between the plaintiff and the defendant. I observe here that Rauh, counsel for the intervenor, was a modestly acting attorney in the courtroom as also were counsel for the plaintiff and the defendant. There was no unusual activity on the part of Rauh which indicated to me that the settlement agreement submitted to me was wrong. All that Rauh attempted to do was argue that there should be no settlement. Secretary counsel, William Kilberg and Stephen Ernst, representing the plaintiff, and Michael Goettsman representing the defendant disagreed with Rauh and together in the courtroom pressed the motion for settlement and the finalization of the case.

Up to that time elections were being held under the International's Constitution at the many fixed places throughout the International area. Counsel for the defendant asserted that the forthcoming convention was to consider the matter of elections by

mail. This was discussed only and nothing more. I reiterated that the Secretary was to hold the election in accordance with the Constitution of the International Union, and I emphasized, throughout, that the election must be held within 90 days. It was totally on that basis that I approved the settlement in spite of the fact that Rauh did not withdraw his objections. In fact, he seemed to believe that he was unsuccessful before me because, in related fashion, he stated, ". . . all my arguments have been overruled". (Tr. page 48). Thus, it is obvious that counsel for the intervenor performed nothing to bring about the settlement, and in this respect could not possibly have benefitted the membership of 1,400,-000 members.

Accordingly, Rauh's objections gained nothing for the membership and even nothing that would give the intervenor more convenience for his forthcoming campaign as a candidate for election. As of that time I had not had all the evidence which I now have before me, but had I then had the full evidence which I now have, I would have realized that Rauh's attempted obstruction of the settlement agreement, which the plaintiff and defendant desired, was not because of any aid to the court for a judicial determination of the case, or for the benefit of 1,400,000 union members, but because Rauh's interjecting not-so-very soluable objections, actually, was to acquire more and extended time for his client's campaigning in a new election. Thus, the objections being an empty gesture, merit no compensatory credits in "bringing out" a settlement.

The evidence of the plaintiff, and in effect corroborated by the admissions of the intervenor's counsel, lent substance to the fact—and I so hold—that the intervenor was a defeated candidate in a labor election, and like millions of defeated American political candidates all the way from committeemen and women to United States Senator, or possibly national presidential elector, or fraternal, corporate, church and even other labor applicants for office, as disappointed candidates, contest unfavorable elections in an effort to reverse them for the purpose of

becoming the ultimate victor; so Sadlowski after losing the election count processed his dispute all the way through the internal machinery of the International. Failing there, he made the next challenge to the Department of Labor by the legal authority given him in the Labor Management–Reporting and Disclosure Act, 29 U.S.C. § 482(b).

## NON–EXISTENT PROOF OF COMMON BENEFIT TO MEMBERSHIP

To support merit to their claims for fees, the claimants contend that the running of a second election for director of District 31 conferred a benefit not only upon District 31, but upon the entire USW membership; first, because the director of District 31 sits on the International Executive Board, the governing body of the USW, and as such official he would be of benefit to the entire union membership; and second, because by the re-running of the election in District 31 the entire membership of the USW was put on notice that election improprieties will not be tolerated. So the claimants put into question two conclusory arguments as a basis for proving that the "common benefit" doctrine is applicable to the instant case sufficiently enough to justify an award of attorney's fees, payable by the total International membership.

■ Judge Van Dusen in *Brennan v. United Steelworkers, etc., supra,* at pages 604–605, stated that the evaluation of the "common benefit" claims must be whether the benefits (1) may be traced with some accuracy; (2) the class of beneficiaries is readily identifiable; and (3) whether there is a reasonable basis for confidence that the costs may be shifted with some precision to those benefitting.

Examining the claimants' contentions in the light of the evaluations of the common benefit rationale, we keep in mind first the fact that Sadlowski's complaint to the Secretary was not the only one among the thirty–five Districts of the International; that five other complaints were registered; that one other complaint that of Anthony

Tomko in District 15 is incorporated in this action with Sadlowski's complaint and that the claimants did not stand out as principal champions and defenders of the 1,400,000 members of the International. The record showed that the Tomko complaint, as well as the Sadlowski complaint were being processed at the same time, and that I, although separately, disposed of each at the behest and common effort of the Secretary's counsel and the Union's counsel. While this part of the record was not introduced into evidence, it is, nevertheless a part of this record as it was before me as Part "A". The settlement of District 15 and the stipulation came before me as a package, as agreed upon between counsel for the plaintiff and defendant and as such, I granted counsel's motion to settle both Part A and Part B of this case. However, the arguments on each came before me separately and I made separate determinations. District 31 did not stand alone, and I know as the presiding judge that District 31 participants did not contribute any aid in the processing of settlement of District 15 in this case.[5]

If, then, the two Districts 15 and 31 were those litigated and settled together as a package, can it be said with any accuracy, with what is before me in this case that the District 31 litigation by the intervenor, helped District 15 also? If so, there is not one bit of evidence in the record or before me that the claimants helped to bring it about. And so far as the claimants' argument that "the entire membership of the USW was put on notice that election improprieties will not be tolerated", it is uncontradicted that at least twenty-nine other Districts did not need such notice because their elections were proper as was verified by the indisputable fact that no complaint was filed by anyone in those particular Districts.

We look at all these principles enunciated by Judge Van Dusen in *Brennan v. United*

*Steelworkers, supra,* that benefits may be traced with some accuracy; that the class of beneficiaries is readily identifiable, and that there is a reasonable basis for confidence of shifting the costs with some precision to those benefitting. In examining the claimants' arguments, which have no foundational facts or evidence to support them, we are left with total doubt as to whether the other 34 Districts can measure up to fitting into the requisites specified by Judge Van Dusen. That means if the common benefit rationale is to apply, the members of the International in a district in Canada, as well as those members in Pittsburgh (where Tomko filed a complaint for District 15) must be commonly benefitted by what the claimants have presented before me. I find not the slightest shred of evidence that any of these districts or the union as a whole has been benefitted by the claimants action. Furthermore, the evidence in the case before me indicates that there is no divisible fund for each District in the entire International, as all District funds are maintained in the control of the Treasury of the International for the benefit of all 35 Districts (See Affidavit of USW Treasurer Frank McKee dated February 13, 1979).

Thus, if we were to give heed to the claimants' baseless arguments, we would have to divide the fund and no means of measuring the divisible part of the fund could be allocated to anyone or more defendants as applied to their possible obligations to pay the claimants' demands. If there is, we do not know what such method would be unless it would be to assess the individual population membership of the defendant, which possibly could he held responsible by reason of the conjectural argument of the claimants. Under the principles laid down by Judge Van Dusen, the contentions of the claimants are completely without merit.

---

**5.** The record is particularly set forth in my Opinion of December 12, 1974, Docket No. 75A and the Order of Court, Docket No. 76A. *See* also, affidavits of Attorney Kilberg and Attorney Kleinman, counsel for the Secretary stating

that District 15 and District 31 were settled at the same time as they were tied together by the attorney for the Secretary and the attorney for the defendant.

In accordance with the guidance of the Court of Appeals, the class of beneficiaries is not readily identifiable because no benefits can be traced "with some accuracy" to any beneficiaries, and so there can be no "reasonable basis for confidence that the costs may be shifted with some precision to those benefitting"–but certainly not to 1,400,000 International members as being commonly benefitted.

Who desired the benefits from the settlement? Well, certainly Sadlowski did in spite of the fact that his counsel opposed it, because there was a new election in which he won the victory which he had sought originally. The circumstances do not matter as to whether they were hotly contested or not at this time. He, Sadlowski, was victorious. Undoubtedly, he benefitted. And since he was campaigning through his counsel all the way through the continuance of the processing of this action, as was shown to be the case by the evidence produced as a whole, it was Sadlowski's counsel's campaign activities which eventually became victorious.

As for any benefits which might be considered to be "common" to the other Districts, there are only fanciful assertions that all the 1,400,000 International members of the Union will be put on notice that election improprieties will not be tolerated – as if all 1,400,000 such members really were in need of such notice; and further, that the election of Sadlowski would "willy–nilly" have been to the common benefit of the 1,400,000 members–if that benefit was in fact needed, or even that the intervenor's election might not actually have been detrimental to any or all these International members.

What is uncontrovertedly obvious to me as a factfinder is that there is no evidence whatsoever that any District including District 31 was affected. If there had been any common benefit to the International or any other District, that evidence should have been presented in the case to make it manifest in order to base a judicial determination entitling the claimants to fees. Otherwise, the claimants required me as a fact-finding judge to assume that their argument was a fact and not just a conclusion that the 1,400,000 International membership was commonly benefitted, and more so that the assumed common benefit was a reasonable basis for shifting the costs of the intervenor's campaign to the 1,400,000 International membership with "some precision to those benefitting". But there is no such factual persuasion of precision benefitting. Neither was there any factual persuasion of precision benefitting 126,000 members in District 31, because the claimants' activities were directed in the irrelevant financial path for procuring inadmissible evidence politically beneficial only to Sadlowski's potential eventual election. Even here if such character of irregularities required notice to the membership, there is no evidence of that.

Under these circumstances, it is impossible for me to trace "with some accuracy" any benefits bestowed upon any of the membership, and especially upon the International membership, as the "readily identifiable beneficiaries". Neither do the claimants' unproved assumption satisfy the dictates of the Court of Appeals as it reflects upon the principle laid down by the Supreme Court in *Alyeska Pipeline Service Co. v. Wilderness Society, et al.*, 421 U.S. 240, 265, n. 39, 95 S.Ct. 1612, 1626, n. 39, 44 L.Ed.2d 141 (1975).

## ATTORNEYS' FEES–TRADITIONAL RULE–COMMON BENEFIT

 The traditional American rule is that attorneys' fees are not ordinarily recoverable by a successful litigant in the absence of statutory or contractual authorization. However, federal courts "in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require." *Hall v. Cole*, 412 U.S. 1, 4–6, 93 S.Ct. 1943, 1945–1946, 36 L.Ed.2d 702 (1973). The inherent power to award such relief "is part of the original authority of the chancellor to do equity in a particular situation." *Sprague v. Ticonic National Bank*, 307 U.S. 161, 166, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1939); *Hall v. Cole, supra*, at page 5, 93 S.Ct. at page 1946.

■ Exceptions to the American rule, created by both the courts and Congress have developed in certain situations "in which overriding considerations indicate the need for such a recovery", such as where the "plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.'" *Hall v. Cole, supra,* at page 5, 93 S.Ct. at page 1946; *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 393–394, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970). In gauging the principles in *Hall* and *Mills* to the instant case, I find it impossible to extract from the evidence in this case as a whole any "substantial benefit on the members of an ascertainable class" bestowed by the claimants. Even with the election of Sadlowski as Director, there is no evidence of whether the District 31 membership was better or worse off with Sadlowski as Director.

Initially this "common fund" or "common benefit" exception to the American rule emerged in situations where through litigation the successful plaintiff enhanced or preserved a fund for the benefit of a class of beneficiaries, since it would be unjust for those who benefitted from the plaintiff's efforts not to contribute to the attorneys' fees, either directly or from the fund or property itself. See *Trustees v. Greenough,* 105 U.S. 527, 531–537, 26 L.Ed. 1157 (1882).

The case law has developed since then so as to allow, for example, an award of attorneys' fees where a plaintiff sued for her own benefit, and her success entitled others to recover out of the same assets by operation of *stare decisis, Sprague, supra,* at page 166, 59 S.Ct. at page 779; where also a plaintiff produced by litigation a non–pecuniary benefit, such as where shareholders conferred a benefit on their corporation by proving a violation of securities' laws, *Mills v. Electric Auto–Lite, supra* ; and where a union member conferred a benefit on the union by vindication of his right of free speech guaranteed under the Labor Management–Reporting and Disclosure Act. *Hall v. Cole, supra.*

■ The underlying rationale for the award of attorneys' fees, or "fee–shifting" based on the common benefit theory, however, remains the same. That basis is the prevention of unjust enrichment, because "to allow the others to obtain full benefit from the plaintiffs' efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." *Mills, supra,* at page 392, 90 S.Ct. at page 625.

With this rationale in mind in this case, what unjust enrichment accrued to the 34 other Districts and their membership? That the claimants argue that Sadlowski sits on the International Executive Board? So what would happen if he did not sit on the Executive Board? What difference did his sitting make? As the factfinder, I do not know. And the claimants' contention that I should conclude benefits either way could only be by surmise. Equitably, I cannot do this.

■ Since 29 other Districts (not filing complaints) did not need "to be put on notice that election improprieties will not be tolerated", how were these 29 Districts and their memberships bestowed "common benefits" and thereby derived "unjust enrichment" by anything the claimants did? For that matter, in addition to the memberships in the 29 Districts, what barest suspicion (let alone evidence) can be levelled at the memberships in the other 5 complaining Districts that their complaints were basically of such character with or worse than that of the intervenor's, and that accordingly they needed "to be put on notice that election improprieties will not be tolerated", and that the claimants' activities would produce for such memberships "unjust enrichment" if the claimants' awards were not shifted to them? And if so shifted, how do we separate them from all the other District memberships? All this is a matter purely for surmise and conjecture, and no factfinder can in good conscience make findings of fact on surmise and conjecture. No evidence whatsoever is here supporting

any contention that all this is not surmise and conjecture.

On the other hand, neither would it be just to enrich the claimants at the expense of the full membership, or a part of the membership, if the claimants were neither the responsible processor of the litigation nor responsible for its successful outcome, as in this case the settlement was not brought about but rather opposed by Rauh who is now one of those claiming bestowal of benefits. Using conjecture only what if Rauh had been successful in obstructing the plaintiff's and defendant's stipulated settlement and final determination? Would the case have been required to go to trial and possibly not have been terminated until sometime in 1975?[6] Would the membership of District 31 have benefitted? Or would Sadlowski have been more benefitted because he had more time to campaign unnecessarily? Who would have benefitted? Since the settlement and final determination of the case was not brought about by the claimants, then the intervenor is no less a beneficiary than are the 1,400,000 members, if in fact they are; but the intervenor is almost exclusively the sole beneficiary at the expense of the Secretary of Labor who conducted the total investigative and legal processing and settling of the case. And even taking the proportion down to the smallest number of possible beneficiaries, there is no evidence in the case that the irregularities complained of by the intervenor were of such a level in his District 31 (or in any other District) as to require notice to just the District 31 members that such irregular election activities would not be tolerated.

The claimants rely heavily on *Hall v. Cole, supra*, where the Supreme Court affirmed an award of $5,500 in attorneys' fees to the respondent who was expelled from his union for deliberate and malicious vilification of union management and who subsequently regained his union membership under § 103 of the Labor Management–Reporting and Disclosure Act. The court held that the respondent's suit not only vindicated his own right of free speech guaranteed by the statute, but furthered the democratic interest of the union and its members as well. The Court reasoned by vindicating his own rights, the successful litigant dispelled the "chill" upon the rights of others. The Court, 412 U.S. at pages 8–9, 93 S.Ct. at pages 1947–1948, stated:

> "Thus, as in *Mills*, reimbursement of respondent's attorneys' fees out of the union treasury simply shifts the costs of litigation to 'the class that has benefitted from them and that would have had to pay them had it brought the suit.' "

The claimants argue that their efforts as well dispelled a similar chilling effect and promoted union democracy. While there can be no doubt that the respondent in *Hall* produced a common benefit for free speech for all members in the union solely through his litigation efforts, the claimants' legal efforts, on the other hand, produced nothing of substance or materiality, nothing that was not, in any event, repetitive or duplicative of the Secretary's intense and massive investigation. Sadlowski's counsel are not precluded from attorneys' fees simply because of Sadlowski's status as an intervenor and the Secretary's dominant enforcement role in this area, but the claimants are not entitled to a free ride on the Secretary's comprehensive accomplishment, without material input; and they are not entitled to compensation for redundant (even if intensive), and at the very best, marginal case work product.

The magistrate also relied on *Wolf v. General Motors–United Auto Workers, Etc.*, 569 F.2d 1266, C.A.3, 1978. Here our Court of Appeals affirmed a District Court's denial of an application for attorneys' fees by counsel who represented certain auto employees in a suit to obtain supplemental unemployment benefits. When the benefits were disbursed by the administrative board at the proper time, the suit was dismissed on the merits as moot; and the attorneys' fees were denied because counsel failed to demonstrate a sufficient causal relationship

---

6. Hearing of March 21, 1974, Tr. 22.

between their efforts and the disbursal of the fund under the "common benefit exception". The Court said in the per curiam opinion:

"[W]e are asked to determine that the efforts of appellants' counsel resulted in a 'common benefit' to a discernible class. Because the facts of this case fall far outside the narrowly circumscribed common benefit exception to the general 'American Rule' that attorney's fees are ordinarily not recoverable by a prevailing litigant in the absence of statutory authorization, (citing *Alyeska, supra*), we affirm." (at page 1267)

"The common benefit exception anticipates, and is necessarily preceded by, a proven causal relationship between the efforts of counsel and benefits allegedly derived therefrom." (at page 1268)

The applicants argued that suit was filed against the GM benefits plan and therefore the benefits were disbursed. The Court responded,

"[I]t would be a logical fallacy to conclude that the resulting payments were caused by an independent suit in federal court." (at page 1268)

Similarly, the claimants here appear to be reasoning that, because Sadlowski intervened, settlement occurred. The claimants have failed to show, by any evidence, cause and effect relationship. I have found through examining the actual sequence of litigation and settlement events that the resulting settlement occurred independently and in spite of the actions of one of the claimants, Rauh. Consequently, they have not demonstrated the required "sufficient causal relationship" between any efforts on their part and the resulting settlement agreement or the satisfactory finalization of the case under the "common benefit" exception.

This court sits in this case much like the umpire in a baseball game. While the umpire does not observe the practice and coaching sessions before the game starts, he should from its very inception be the most knowledgeable individual of what in common vernacular "the game is all about".

So, too, in this case I am observant of the pleadings and am familiar with their contents. The in-court appearances by the parties came under my close scrutiny. Their in-court participation and activities premised the fundamental parts which each of the parties, plaintiff, defendant, intervenor and intervenor's counsel played toward the eventual outcome in the determination by me of the case. As I look back over the whole proceedings and review the transcripts and the pleadings, and with special detailed examination of the part which the intervenor and the claimants played, I observed quite clearly the whole process and the record contributions which made the eventual satisfactory termination possible, and must make my findings and decisions in accordance with the facts, both legally and in equity.

## SUMMARY OF MAGISTRATE'S FINDINGS OF FACT

The magistrate addressed the threshold issue of whether or not any benefit was bestowed on the membership as a result of the actions of the intervenor and the claimants. After my examination of the record, I affirm and also adopt his findings. He found that:

1. In order to preserve issues for presentation to the Secretary, only minimal requirements are imposed; that these obligations could readily be fulfilled without the assistance of counsel; and that the assistance of counsel was not necessary to preserve matters for presentation to the Secretary.

2. A complaint filed with the Department of Labor need only set forth several allegations, and a formal legal document prepared by counsel is not necessary to invest the Department with jurisdiction to investigate and ultimately to sue.

3. During the period between June 25, 1973 through August 1973 and until recommendation of the Department to file suit, an intensive investigation by the Secretary occurred.

4. The intervenor did not influence the Secretary's decision to sue, as Solicitor Kilberg stated, "... [a]t no point in time, was there ever any doubt that, short of a satisfactory settlement, the Department would sue in District 31."

5. Extensions of time before the filing of suit were for the purpose of allowing USW to investigate the election.

6. Although the intervenor contends that it became necessary to retain Attorney Rauh to expedite the proceedings, the actual intent was to politically assist Sadlowski's new campaign.

7. Despite Rauh's contention that his three or four conversations with Mr. Lagather "caused labor to file suit", the uncontradicted evidence from Solicitor Kilberg creditably demonstrates that Rauh did not provide any factual information which was not already in the Department's files; that Rauh did not advance any legal arguments which the Department had not already considered and that Rauh's statements had no effect on the decision to file suit in District 31.

8. Rauh's efforts at the hearing on the plaintiff's motion for expedited discovery on March 21, 1974 had no effect on the final outcome of the proceedings which took place as rapidly as possible within the limitations of plaintiff's counsel's other commitments.

9. Although the intervenor alleges that he strongly influenced the theory of prosecution by the Department, the evidence from the record, specifically from the plaintiff's trial counsel Ernst, indicates that the theory of prosecution, actual prosecution and settlement of the lawsuit was not affected by anything said or done by the intervenor.

10. The discovery undertaken by the intervenor produced no useful evidence which the Department did not already have as a result of the DOL's massive investigation.

11. Although the intervenor claims credit for blocking "unsatisfactory undemocratic settlement proposals", the contention that the intervenor blocked the splitting of the District is refuted by the evidence from three DOL affidavits which show that this proposal had been rejected by the Secretary prior to its ever having been communicated to the intervenor; and the contention that the intervenor prevented multiple nominations in the rerun election is also refuted by the evidence that this became a moot point when Evett agreed to be a candidate in the rerun election.

12. The intervenor took no helpful or compelling part in the settlement negotiations.

13. The intervenor refused to be a party to the settlement agreement, which had to be redrafted excluding the intervenor as a party.

14. None of the intervenor's objections to the settlement agreement was sustained at the hearing on August 23, 1974.

15. There was no intention of rerunning the District 31 election at the outside limitation date of November 29, 1974, and thus, the intervenor's claim that his efforts preserved union democracy by preventing the election being conducted on Thanksgiving weekend is without merit.

16. The court broadly approved conducting the election in conformity with Union regulations and Title IV, and no specific recommendations by the intervenor were adopted by the court.[7]

## IDENTITY AND DEMANDS OF CLAIMANTS

In examining every facet of the claims which the claimants are making for payment of fees, in fact and in law, I have not overlooked a circumstance that it was Sadlowski (not the claimants) who filed the complaint originally with the plaintiff. I

7. I have already discussed the settlement procedure before me and cite the Magistrate's findings to show only the accuracy of the Magistrate's observations and holdings. Also, as I refer only to the intervenor in the Magistrate's findings, I infer and include also such claimants as are related to the specific findings or additional findings to include them as any or all claimants in the case before me.

also observe that Sadlowski would have been deprived of the ultimate victory as a Director in District 31 if he had not filed the complaint with the plaintiff, and if the plaintiff after investigation had not brought this action, and if the plaintiff had not worked with the defendant for the ultimate settlement and Sadlowski's eventual victory. To a rational extent, Sadlowski did render some services to the Secretary as he did for himself. This, then, might be considered as a service rendered by Sadlowski personally in aid of the Secretary. I must consider also that Sadlowski did not do this because of his beneficent attitude towards the membership of the International Union, but only because Sadlowski was hoping to benefit personally from the Secretary's conduct. If I could separate personal services rendered by Sadlowski to the Union, either for the District or the International, I might have been able to fairly and justly determine upon a basis for compensation–if this had been done through attorneys, or even the claimants (even though Sadlowski claims nothing personally for legal costs)–but I have nothing before me to give me the slightest foundation for such a finding and determination. On the other hand, I have before me an abundance of highly credible evidence which indicates that what Sadlowski did before filing the complaint with the Secretary was as a defeated candidate. In this respect a holding that any funds are due Sadlowski for such under the present claims of counsel for compensation would be improper.

While another matter which I have considered is not directly apt in making this holding, I deem it informative to discuss here certain evidence of the claimants which affects the credibility of the assertions and allegations made in support of their claims.

In the narrative statement filed by the claimants and in certain affidavits and depositions as filed by them before the magistrate, a total claim was made for approximately $96,000.00 (Narrative Statement, page 2). A breakdown in these pleadings is as follows:

1. Joseph Rauh, claimant, asserts an expenditure of 235 hours (Intervenor's Narrative Statement, page 7). These hours are taken from entries on a calendar and are summary hours without details.

2. Leon Despres, claimant, asserts an expenditure of approximately 256 hours with some reasonable detail for 167.5 hours, but admits that 88.5 [8] hours have no records at all (Intervenor's Narrative Statement, page 8), and are without details.

3. Judith Schneider, claimant, a law student at the time, asserts expenditure of 1,279 hours, but admits that at no time did she make any time record, and the hours set forth are mostly her estimate (Intervenor's Narrative Statement, page 9), and are without details.

4. Kenneth Yablonski, claimant, asserts an expenditure of 15 hours, which he admits is from memory and unsubstantiated from any diary or record (Intervenor's Narrative Statement, page 9), without details.

In each of these individual claims, the hourly estimate of time was set forth by the individuals on the theory that this was the standard amount claimed under such circumstances, except in the case of Miss Schneider which was based upon what salary she had been receiving.

Miss Schneider is requesting $20.00 per hour in addition to the salary that she received in 1974 from the Association for Union Democracy. She now claims that her hourly rate of pay of $5.00 per hour was a "ridiculously low base figure", and that she should be awarded an additional $25,580.00 out of the Steelworkers' Union dues, without having presented convincing evidence that her work merits any increase whatsoever. (See Narrative Statement at page 11) I find that her work, which was predominately non-legal and political in nature, has already been adequately compensated.

I have cited these only to indicate that I have most carefully examined the record in an effort to give credibility, where credibili-

---

**8.** Of course, I question how he could account for 88.5 hours by memory alone.

ty was due, and not to deprive the claimants of any just compensation or fees where so entitled. Since I have already discussed these matters before, I merely repeat this now for the purpose of showing one of the elements upon which I have arrived at my conclusion based upon the preponderance of all of the evidence in the case as a whole.

I am also aware of the fact that since our law now is rather liberal in granting attorneys' fees in any number of ways, that oftentimes a claim for counsel fees is abused. I am reminded here of what was held in *Brown v. Stackler*, 612 F.2d 1057, 1059, C.A. 7, 1980. There an attorney made an exorbitant demand which was not supported by the evidence and the district court denied the attorneys' fees as claimed. The Court of Appeals affirmed the District Court decision and in an opinion by Judge Edward Dumbauld stated that such a denial of such an outrageously excessive fee demand will be a " . . . hopefully effective means of encouraging counsel to maintain adequate records and submit reasonable, carefully calculated, and conscientiously measured claims when seeking . . . counsel fees." Judge Dumbauld further stated in this opinion:

"If, as appellant argues, the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place. To discourage such greed a severer reaction is needful, and the District Court responded appropriately in the case at bar." (612 F.2d, at page 1059).

While I am in agreement with the philosophy laid down in *Brown v. Stackler, supra*, of containing counsel's fees demands ethically within the realm of certainty, I consider the proof of the claimants in this case in the aspect of another element by which I determine credibility. The details of services rendered by them do not add any weight to their claims for entitlement of fees, when viewed in the evidence as a whole as it contains contradictory assertions and arguments as made by the claimants.

## SUMMARY

The defendant, United Steelworkers of America, AFL–CIO–CLC, held an election on February 13, 1973, for the selection of directors in its 35 Districts throughout the United States. Six complained to the plaintiff, the Secretary of Labor, that irregularities had been practiced in their elections. The Secretary immediately put to work his team of expert Compliance Officers to investigate these six complaints. Of these they found two where there was a likelihood of irregularities. These were from Anthony Tomko, the defeated candidate in District 15 in the Pittsburgh area, and from Edward Sadlowski, the defeated candidate in District 31 in the Chicago area.

An overly abundant amount of evidence was amassed both in the Pittsburgh and Chicago Districts under the skilled supervision of the Secretary's counsel; and on the recommendation of counsel this action was commenced by the Secretary. Complainants Tomko and Sadlowski intervened, but Sadlowski gathered around him a crew of attorneys whose prime function was to inaugurate depositions to discover financial matters. The Secretary, however, had held that no financial irregularities were practiced so he did not include such an averment in his complaint as filed in this court. Nevertheless counsel for Sadlowski instigated depositions relating to financial matters for the purpose of providing material for a second campaign for the election of Sadlowski, knowing as attorneys that such evidence could not be made a part of this case, as such matters went beyond the averments contained in the Secretary's complaint, contrary to *Trbovich, supra*.

Districts 15 and 31 phases of this action were separated into Parts A and B, and both parts were processed before me eventually to settlement terminations. The Secretary's Compliance Officers and counsel had amassed a large amount of evidence as to make it unnecessary for the Secretary to

initiate any discovery after the action was filed. The defendant indicated need for discovery in District 31 in Chicago, and at which this court was asked to preside for a week, but that never materialized.

This court in an effort to procure a settlement had learned that the plaintiff and defendant had been negotiating for settlements in both Districts. This court encouraged counsel to continue to do so. Counsel for the Secretary and the International Union eventually presented a motion to approve such a package settlement agreement for both Parts "A" and "B", Districts 15 and 31. One of Sadlowski's counsel, who had appeared in the previous two open-court matters before me but had done nothing to further the final determination of the case or aid the plaintiff, also appeared at the settlement hearing on Part "B", District 31 and objected. He presented two reasons for disallowing the settlement; one, that the re-election would be held around Thanksgiving Day as an interfering inconvenience to the membership; and two, that an election by means of mail balloting could not be effective. I overruled both objections. The first, because my order would have included an election under the exclusive supervision of the Secretary of Labor within a maximum period of 90 days to which both counsel for the plaintiff and defendant gave me assurance that the re-election would be held before Thanksgiving time; and second, because no evidence had been presented before me of any mail balloting, and so I concluded that it was injected by counsel for the intervenor superficially for the purpose of preventing the settlement. In discussing this second objection in open court by counsel without contradiction, the question of a mail balloting method was to be presented at the forthcoming convention of the International, but that this could not be retroactive. I ruled that a second election must be held and completely supervised by the Secretary closely and in line with what was the processing of the first election. I held that the objections made in behalf of the intervenor were without merit and dismissed them. I ordered a Secretary controlled re-election in District 31. The new election was eventually held satisfactorily and legally under the efficient supervision of the Secretary and Sadlowski was elected as Director of District 31.

Thereafter, a "Verified Application For Attorneys' Fees" was presented to me for payment of various sums of money for four individuals, three attorneys and one law clerk, who had been in permanent employment elsewhere, on declarations of service for the intervenor. No request was made by the claimants for a hearing to support their claims. No records of accounts, no verification of customary and usual entitlement of earnings was presented, and I was presumably required to charge the claims to the members of the International. I was given no factual or legal supports to do so and I denied the claims on the sole question presented before me (a legal one) that the statutory law did not authorize this court to allow counsel fees.

On appeal our Court of Appeals held that while there was no statutory authorization for entitlement for such payments, there was nevertheless an equitable philosophy known as the "common benefit doctrine" which could entitle the claimants to compensation on their presumed averments if proved and if proved pointedly by defined legal and factual guides that such common benefits were traceable with some accuracy to all the members of the International Union as a readily identifiable class of beneficiaries. The matter was referred back to me for such determination, and if so proved, in what compensatory amount.

When it came back to me I referred the matter a second time to the United States Magistrate who inquired widely and in depth, and who received a vast amount of affidavits, exhibits and other evidence as would give him a clear and comprehensible knowledge and insight of all the circumstances of the demanded claims. The magistrate made detailed and explanatory findings of fact and set forth many consistencies, inconsistencies and contradictions in the evidence, and as well a recital of legal principles. He recommended denying the claims. The claimants objected and the defendant filed an answer to these objections.

The matter then came to me for further consideration. I reinquired into all of the evidence in the case as submitted and added findings of fact on the evidence, and of that which came before me as the presiding judge. I observed the details and set forth the inconsistencies and deficiencies of the claimants' case as I determine these in findings of fact from the substantial preponderance of the evidence in the case as a whole.

As for the guidelines which Judge Van Dusen in the Court of Appeals had set forth as the method by which the "common benefit" rationale was to be applied and findings made thereon, I find the claimants' case to be totally wanting in fact and in equity in accordance with the prescribed law.

Judge Van Dusen had indicated that, while counsel fees generally might not be available to claimants as I had originally ruled, there was the possibility that the claimants might be entitled to counsel fees for the "common benefit" bestowed to the total membership of the defendant International.

I find from all the evidence that the total membership of the Union was approximately more than 1,400,000; that these were divided into 35 unions over the United States; that of the 35 unions, only six had complained of irregularities in the past election; that of these 6, only 2 had any substantial basis upon which the Secretary of Labor could proceed in filing this action; that these two complaints were initiated by the two defeated candidates in Districts 15 and 31; that the Secretary had dismissed complaints of irregularities in the other 4 Districts; that 29 of the Districts had no complaints and so we have the right to conclude that these were devoid of any irregularities; that in District 31 the defeated candidate Sadlowski hired a crew of attorneys whose efforts and activities from the beginning were aimed for his eventual election; that his counsel proceeded with depositions relating to financial matters which had no relationship to the issues in the Secretary's case and which would not have been admissible in any evidence in this court proceeding; that all of these claim-

ants' efforts were directed in these channels and none of them for the benefit of the plaintiff or the final determination of the case; that one of the claimants, as counsel for Sadlowski, actually attempted to defeat a finalization of the case by the settlement between the Secretary and the Union, assumedly in an effort to extend the time for campaigning for Sadlowski's eventual election; that if the attempt to prevent the settlement by Sadlowski's counsel had succeeded, the case would have continued on for a year or two, or longer, with no possible benefit to the District 31 members and obviously not to the Union as a whole; that the objections as made for the final settlement in open court before me were without fact and merit, since I had ruled that the election must be held within 90 days and within the law under the exclusive supervision of the Secretary of Labor; that counsel for the plaintiff and defendant cooperated with the court in arriving at the settlement and termination of the case contrary to the wishes of Sadlowski's counsel; that the settlement of Part "A" action relating to District 15 was part of the package settlement with District 31, Part "B", between counsel for the plaintiff and defendant; and, that I held separate hearings on these and agreed to separate settlements relating to each.

As for the accrual of benefits and to whom, I hold: that Sadlowski's counsel claimants did nothing to aid in the disposition of this case; that the claimants' argument for entitlement based on the statements by the claimants (1) that Sadlowski would be a member of the Executive Board of the International was presented only as an argument with conclusion and without any evidence or showing of how, why or when; and (2) that the claimants' statement, that members of the International would be put on notice that election improprieties would not be tolerated, was not only a baseless but a contradicted speculation because we know that 29 out of 35 International Districts held regular, orderly and compliant elections and the elections in 4 other Districts were held to be in good order by the Secretary, and even in Districts 15 and 31 no proof was presented of

any need of warnings. Furthermore, no evidence whatsoever was presented to sustain the requirements enunciated under the common benefit doctrine that (1) the benefits may be traced with some accuracy; (2) the class of beneficiaries is readily identifiable; and (3) whether there is a reasonable basis for confidence that the costs may be shifted with some precision to those benefitting.

■ Thus, in fulfillment of the guides placed upon me by the Court of Appeals, I hold that the claimants have not proved by the preponderance of the evidence in this case that the claimants' alleged services resulted in any traceable "common benefit" to the defendant International membership either totally or in identifiable part or parts, or even to the members of Districts 15 and 31; or that there is any reasonable basis for confidence that such a cost or costs can be shifted with some precision to 1,400,-000 benefitting members of the defendant or any identifiable part or parts of Districts.

Under all these circumstances I conclude, find and hold that the claimants' services were rendered in behalf of Sadlowski's forthcoming campaign for a new election; that they contributed nothing at all to the plaintiff's case or for the finalization of the case; and that if it had been up to them, the case might yet have been in process. Having been the presiding judge in the case, and having had it come before me and knowing as much of the facts as I did, which were attempted to be contradicted in the claimants' narrative statement, arguments and affidavits, I am fully informed and knowledgeable and able to determine their contradictions, especially about what I did and said in court and their misstatements and exaggerations in that regard, and I arrive at the full capability of making findings of fact from the vast preponderance of the evidence as a whole. In law and in equity, contribution to the individual claimants of the sums claimed by them from innocent and unbenefitted persons belonging to any or all of the unidentifiable membership of the International Union would be unjust and unconscionable.

As for the sums of money claimed here for possible benefits, no evidence exists in the record, let alone a preponderance of all the evidence of the case as a whole, of what services were spent or for whom of the 1,400,000 members of the defendant, or segment of them–all this in accordance with the requirements laid down by the Court of Appeals.

### MAGISTRATE'S REPORT AND RECOMMENDATION

Accordingly, after my fullest inquiries into the record, the examination of all the affidavits which were presented and of the further examination of the pleadings as all this was aided by my own recollection in this case, when all these were compared and examined with the findings of the magistrate, I corroborate the very detailed statements and findings of the magistrate. As to this, I find that the magistrate made long and careful inquiries and set forth detailed facts unerringly. While I am in agreement with the findings of the magistrate, I do not rely solely upon his report and recommendation, since I have independently made my own findings of fact and conclusions of law and determinations. Also, while I adopt the findings of the magistrate, I basically make my own findings and conclusions additionally with those made by the magistrate. I hold that the evidence shows:

1. Claimants' fees for service lacked a causal connection of "common benefits" to any group of members.

2. Lack of accurate traceable benefits to any group of members.

3. No readily identifiable beneficiaries.

4. Lack of evidence to provide a basis for shifting with some precision costs of alleged benefits.

5. Contradictory and fallacious statements.

6. Insufficient proof in the required burden of claimants by a preponderance of evidence in the case; and,

7. Fractured or non–existent records of entitlement earnings.

934

It will be seen that I have not only followed the prescription provided by Judge Van Dusen of inquiring into proven "common benefit" accrual to the defendant as a whole, but also to its various component 35 District part memberships, and even as well to any possible proved "common benefit" to District 31 membership, and that I have projected the guideline principles more than required–all for the purpose of making an equitable and legal judgment.

On the record as a whole and on the law by which I am directed, I find insufficient support for the claims for counsel fees as made by the claimants. For all the reasons set forth in the Opinion, I find that the Verified Application For Attorneys' Fees should be denied.

The Findings of Fact and Conclusions of Law are incorporated and made a part of this Opinion in accordance with Federal Rule of Civil Procedure 52.[9]

---

9. Rule 52. Findings by the Court
(a) ". . . If an opinion, or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein."